**FILED**

SEP **16** 2011

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**LAYLA MARIE McGRADY,**

      **Plaintiff,**

**v.**

                                         **Civil Action No.** *1:11CV10*
                                         **(The Honorable Irene M. Keeley)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

### REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

### I.  Procedural History

Layla Marie McGrady ("Plaintiff") filed applications for SSI and DIB on September 6, 2007[1], and September 24, 2007, respectively, alleging disability since August 25, 2007, due to broken pelvis, broken back, broken tail bone and anxiety (R. 103, 112, 141, 151). The state agency denied Plaintiff's applications initially and on reconsideration (R.52-55). Plaintiff requested a hearing,

---

[1]September 6, 2007, was Plaintiff's protective filing date.

which Administrative Law Judge Timothy C. Pace ("ALJ") held on September 24, 2009, and at which Plaintiff, represented by counsel, Alan J. Nuta, and Dr. Ryan, a vocational expert ("VE"), testified (R. 27-51).  On October 20, 2009, the ALJ entered a decision finding Plaintiff was not disabled (R. 18-26).  On December 2, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. Statement of Facts

Plaintiff was born on May 24, 1974, and was thirty-three (33) years old on the onset date (R. 24).  Plaintiff graduated high school and has past relevant work as an orthodontist technician, for which she is certified (R. 24, 30, 364).

On August 25, 2007, Plaintiff reported to the emergency department of the Outer Banks Hospital for treatment of injuries sustained after she fell from a fishing pier (R. 229-31). Plaintiff was admitted to the hospital (R. 233).

On August 26, 2007, an x-ray of Plaintiff's lumbar spine showed no acute osseous abnormalities and mild degenerative disease at L5-S1 (R. 235).  Plaintiff's pelvis x-ray showed "left acetabular fracture"; "bilateral inferior pubic rami fractures"; and no dislocations (R. 236).  A CT scan of Plaintiff's abdomen and pelvis showed a "comminuted left sacral fracture" that "involve[d] several of the left-sided neural foramina and extends to the inferior aspect of left sacrum and left sacroiliac joint. Several small fracture fragments [were] seen inferiorly. There [was] increased density in the presacral soft tissue suggesting contusive changes and probable hematoma." Bilateral inferior pubic rami fractures were also found (R. 237-38, 237-38).  A CT scan of Plaintiff's cervical spine showed no "evidence of acute cervical spine injury" (R. 239).  The CT scan of Plaintiff's head and cervical spine was normal (R. 240).  Plaintiff's left elbow x-ray was normal (R. 404).

On August 26, 2007, Plaintiff was admitted to Sentara Norfolk General Hospital for injuries she sustained in the fall.  Dr. DeGuzman's examination of Plaintiff showed she was alert and oriented, times three; bilateral upper extremity strength was four (4) out of five (5) "proximally as well as distally with normal muscle tone and range of motion."  Plaintiff's lower extremities strength was three (3) out of five (5) proximally, "very pain limiting."  Plaintiff's sensory examination to light touch was normal (R. 398).  Except for "musculoskeletal pain in the left humerus, left forearm, left ankle, and bilateral hips and pelvis," Plaintiff's systems were normal (R. 414-15).

The August 26, 2007, x-ray, taken at Sentara Norfolk General Hospital, of Plaintiff's pelvis showed "bilateral inferior pubic rami fractures: the right is distracted and the left is comminuted. Left superior pubic ramus fracture, minimally displaced" (R. 407).  Plaintiff's CT of her pelvis showed "[c]omminuted and minimally displaced left sacral alar fracture extending completely from anterior to posterior."  There were "[l]inear transverse superior pubic rami fractures, nondisplaced" and "[p]resacral space hematoma without disruption of the rectum" (R. 411-2). Plaintiff's CT scan of her head was normal (R. 413).

Harry Molligan, M.D., completed a surgical consultation of Plaintiff on August 26, 2007. Upon examination, Plaintiff was neurovascularly intact in her hands and her upper extremities ranges of motion were normal.  There was tenderness with palpation over the lateral aspect of the left elbow (R. 405).  Plaintiff had pain with hip range of motion; she was neurovascularly intact in both feet and had normal range of motion of her knees and ankles.  Plaintiff's pelvis was stable "with AP and lateral compression."  Dr. Molligan noted "some mild tenderness with palpation over the pubic symphysis" and "tenderness with palpation over the SI joint on the left side."  Dr. Molligan's plan was to "mobilize with physical therapy, toe touch weightbearing on the left" (R. 406).

3

She was discharged on August 28, 2007. Plaintiff was stable (R. 394). "Orthopedic recommendation was to mobilize the patient with physical therapy, toe-touch weightbearing on the left side and for no operative intervention." Plaintiff "did complain of some pain" during her hospitalization. Plaintiff was released to home and instructed to undergo follow-up care with her primary care provider. Plaintiff was prescribed Percocet. Plaintiff was encouraged to ambulate with crutches or a walker (R. 395).

On September 2, 2007, Plaintiff presented to Frederick Memorial Hospital with complaints of pain. Plaintiff reported she had broken her tail bone and pelvis the previous Saturday and had "[run] out" of Percocet (R. 253). The x-ray of Plaintiff's pelvis showed "[b]ilateral superior and inferior pubic ramus fractures which [were] minimally displaced. The left ischial fracture may be comminuted. The left superior pubic ramus fracture extends into the lower third of the acetabulum. There is diastasis of the left sacroiliac joint" (R. 259). The x-ray of Plaintiff's sacrum-coccyx showed "no evidence for a fracture of the sacrum or coccyx but there [was] diastasis of the left sacroiliac joint as noted on the pelvis film" (R. 258). Plaintiff was prescribed Percocet (R. 254).

Plaintiff was evaluated by Dr. Gens at the University of Maryland Medical Center on September 3, 2007. Plaintiff reported she could not "ambulate secondary to pelvic pain." It was noted that, at the time of the injury, Plaintiff was informed she did "not need surgical intervention" and was discharged to home with pain management and the recommendation that she undergo "aggressive" physical and occupational therapy. Dr. Gens prescribed Oxycodone for break through pain and MS Contin for pain management. Dr. Gens "recommended nonoperative management with weightbearing as tolerated on the right side and nonweightbearing on the left" (R. 263-66).

Plaintiff's September 3, 2007, CT scan of her pelvis showed the following: ". . . The fracture

line crosses the midline to the right at the level of S3.  The pubic rami fractures and the diastasis in the left SI joint are better appreciated in the 3-D reformatted images. [T]he left fracture of the superior pubic ramus extends into the ventral column of the left acetabulum" (R. 267).

The x-ray of Plaintiff's pelvis on September 3, 2007, showed "displaced fractures of the superior and inferior pubic rami bilaterally as well as minimally displaced fracture of the left L5 transverse process" (R. 268).  The CT scan of Plaintiff's thoracic and lumbar showed the following: "1) Complex left sacrum fracture (involving zone 1-3)"; "2) Pubic rami fracture bilateral extending into the left acetabulum"; and "3) Transverse process fractures L3 and L5" (R. 270).

Plaintiff was "re-evaluated" by Dr. Casey at Parkview Medical Group on September 4, 2007. He reviewed Plaintiff's September 3, 2007, CT scan and prescribed Oxycodone 20 mg (R. 279).

Plaintiff's September 11, 2007, x-ray report was as follows: "Five views demonstrate displaced fractures of the superior and inferior public rami bilaterally as well as minimally displaced fracture of the left L5 transverse process" (R. 261).

Dr. Nascone examined Plaintiff on September 11, 2007, for "left-sided LC I pelvic ring disruption."  Dr. Nascone noted Plaintiff had been "transferred to Shock Trauma" eight days after her August 25, 2007, fall, and, at the time of transfer, the doctor evaluating Plaintiff had instructed Plaintiff to have no weight bearing on the left side and weight bearing as tolerated on the right. Upon examination, Dr. Nascone noted Plaintiff was "resting in a wheelchair"; her left lower extremity sensation was intact.  Dr. Nascone evaluated Plaintiff's x-ray and found the "inlet and outlet show[ed] intact pelvic right without any evidence of pelvic ring disruption or change from her prior x-rays."  Dr. Nascone recommended Plaintiff be treated by a "local pain specialist." He prescribed "MS Contin and Percocet for break-through pain."  Dr. Nascone instructed Plaintiff to

"continue with her current weightbearing status and follow up in four weeks" (R. 262).

Plaintiff returned to Dr. Nascone on October 9, 2007, and reported she continued experiencing pain "around her pelvis," which extended to her thigh and "some dysesthesias in her left foot." Plaintiff had not been evaluated by a pain management specialist. Upon examination, Dr. Nascone found Plaintiff was neurovascularly intact; her sensation was intact with "some hypersensitivity over the dorsum of her left foot"; her pulses were symmetric. Dr. Nascone opined Plaintiff had "poor effort with respect to manual motor testing." Plaintiff refused to undergo x-rays because she was "not clear whether she [was] pregnant . . . ." Dr. Nascone instructed Plaintiff to "get[] involved with a pain management specialist" and recommended Plaintiff engage in a "therapy program to help with her overall deconditioning." Dr. Nascone opined Plaintiff could "be weightbearing as tolerated bilaterally" (R. 260).

In an undated letter, directed "To Whom It May Concern," Dr. Nascone wrote that Plaintiff was transferred to the University School of Medicine's Shock Trauma department for a "status post a left sided LC I pelvic ring fracture." Dr. Nascone opined that he "suspect[ed] that [Plaintiff] will be out of work for at least 12 months." Dr. Nascone also wrote that Plaintiff would "continue to follow-up with" him (R. 278).

On October 14, 2007, Plaintiff presented to the emergency department of Washington County Hospital with complaints of left-sided pelvic pain. Plaintiff could extend and flex her leg; she had difficulty abducting and adducting her leg. Plaintiff had good sensation, distally (R. 438). She was diagnosed with pelvic fracture and chronic pain. She was prescribed Soma and Dilaudid and instructed to be "rather insistent on having her primary care doctor take care" of her pain (R. 439).

The October 15, 2007, x-ray of Plaintiff's pelvis showed "mildly displaced fractures of the superior and inferior pubic rami bilaterally. The superior pubic rami fracture is at the junction with

the acetabula" (R. 441).  The x-ray of Plaintiff's foot was normal (R. 442).

On October 18, 2007, Plaintiff presented to the emergency department of the Winchester Medical Center with complaints of "pelvic discomfort and low back pain."  Plaintiff denied lower extremity weakness.  She was, according to Dr. O'Mara, "at baseline apart from her low back pain and pelvic discomfort."  Dr. O'Mara's examination revealed Plaintiff was in no acute distress; her HEENT, neck, chest, cardiac and abdominal examinations produced normal results (R. 421).  Dr. O'Mara found no clubbing, cyanosis or edema of Plaintiff's extremities.  Her motor strength and sensory exam were intact throughout.  She had 5/5 strength to "both plantar flexion and dorsiflexion" and all extremities.  Plaintiff's lower extremities were symmetric; she had negative Homans sign; she had no tenderness or swelling.  Plaintiff was alert and oriented, times three.  Dr. O'Mara found pelvic tenderness in "the area of L5"; no soft tissue swelling; and no external cutaneous changes (R. 421-22).  Dr. O'Mara opined Plaintiff showed "no significant findings on physical examination of any acute pathology" and had no "concerning findings on physical examination."  He observed that Plaintiff had "twice gotten up and walked out to smoke cigarettes."  He noted Plaintiff sought "narcotic relief."  Dr. O'Mara referred Plaintiff to the University of Virginia for evaluation (R. 422).

The October 18, 2007, CT scan of Plaintiff's pelvis showed "nondisplaced fractures involving the superior and inferior public rami bilaterally," which did "not extend into the acetabulum" and did not "involve the femoral necks.  There [was] also a minimally displaced fracture involving the left sacral ala . . . .  Incidentally noted [was] a focal central disc protrusion/herniation of the L4-5 disc.  There [was] prominent central bulging of the L5-S1 disk" (R. 432).

Also on October 18, 2007, a MRI of Plaintiff's lumbar spine was made.  It showed the following: "Broad-based degenerative disc protrusion at the L5-S1 level that is central and eccentric

to the right, that displaces the right S1 nerve root and results in mild right neural foraminal stenosis.

. . . A central to rightward disc protrusion at the L4-5 level which results in mild right lateral recess

stenosis. . . . Lumbosacral scoliosis" (R. 433).

On October 19, 2007, Plaintiff was treated by Dr. Ellis at City Hospital for pelvic pain. Dr.

Ellis noted that Plaintiff reported she needed to "find a local physician since she . . . moved to this

area." Dr. Ellis also noted Plaintiff stated "she was on a walker and has been prescribed crutches

2 weeks ago and yet when I asked her who prescribed the crutches, she stated that she was prescribed

the crutches after her injury and fall in August." Plaintiff reported she had not "been on . . ."

Klonopin and OxyContin, for 'a couple of weeks.'" Plaintiff's urine drug screen was positive for

benzodiazepines, marijuana, and opiates. Dr. Ellis found "some paraesthesias of her left upper

extremity, weakness in the left lower extremity that has occurred since her injury." Dr. Ellis noted

that it was "very difficult to evaluate [Plaintiff] since she has extreme pain when [he] palpat[ed] her

foot, yet [he saw] no changes in the skin or specific local tenderness." Plaintiff had no pain, with

palpation, of her cervical, thoracic, or lumbar spine. Plaintiff had "mild pain on palpation of the

paraspinal muscle." Plaintiff's lower extremity strength, sensory, and reflexes were symmetrical.

Plaintiff ambulated with crutches. Dr. Ellis prescribed Voltaren and "refused to give [Plaintiff]

narcotic pain medication nor medications for anxiety." Dr. Ellis noted Plaintiff "was clearly not

happy with this treatment plan and was angry that [he] had performed a urine drug test stating that

she had 'not authorized that testing.'" Dr. Ellis also noted that it was "clear that [Plaintiff's] history

[was] inconsistent and it [was] very concerning that [Plaintiff] may be using illicit drugs." Dr. Ellis

instructed Plaintiff to "follow up with a regular physician." (R. 493-95).

On October 23, 2007, Alex Ambroz, M.D., First Priority Medical Choice, examined Plaintiff.

He found Plaintiff had no weakness or fatigue; her neck, chest, lungs, neurological and mental examinations were normal (R. 332).  Plaintiff had no tenderness, no spasm, and good ranges of motion in her cervical spine.  Plaintiff had good ranges of motion of all joints in her extremities.  She had no atrophy, clubbing, cyanosis or edema.  Her peripheral pulses were full.  Plaintiff's back was tender, upon palpation.  She was positive for back spasm.  Dr. Ambroz noted Plaintiff had decreased ranges of motion of her lumbar spine.  Plaintiff's flexion was thirty (30) degrees; extension was fifteen (15) degrees; left and right lateral flexions were ten (10) degrees; pain on straight let raising test to twenty (20) degrees; pain on straight leg raising test in the sitting position; and pain getting up on and down from the examination table.  Plaintiff's lower extremity strength was 4/5.  Plaintiff's "sensory nerve conduction tests . . . reveal[ed] abnormalities consistent with acute pain." She could not walk on heels and toes and could not squat and rise without difficulty.  Plaintiff's motor strengths and hand grips in her upper extremities were 5/5 (R. 333).

On October 24, 2007, Terry Chambers, D.C., of First Priority Medical Choice, completed an "Examination Report" of Plaintiff.  Plaintiff reported that she experienced low back, left leg, and left hip pain.  Plaintiff stated she had "difficulty finding a pain-free state."  Plaintiff took "care of her ADL list" but stated it was "painful for her to look after herself."  She needed help dressing.  Plaintiff reported she had "partial difficulty with any kind of . . . bathing, showering, going to the toilet, difficulty with washing or drying her hair, computer work, vacuuming, making the bed, ironing or any kid of household chores or outdoor chores."  Plaintiff reported her condition was "progressive" and that she had only been treated in an emergency room.  Plaintiff stated she could not "lift or carry anything at all."  Plaintiff walked with either a cane or a crutch.  Plaintiff could sit or stand for ten (10) minutes. Plaintiff reported she could not "sleep at all without tossing and turning and she [was]

9

unable to have intermarital relationship." Plaintiff could take "short journeys of less than 30 minutes." She reported that she realized "very little relief from pain" with her pain medications. Plaintiff stated she medicated with Percocet, Tramadol, and Flexeril and was prescribed Lyrica (R. 284). Plaintiff's straight leg raising test was positive on the left and negative on the right. Dr. Chambers opined Plaintiff would "probably benefit from nerve blocks and injections, and narcotic step-down protocol is recommended." Dr. Chambers further opined Plaintiff would benefit from acupuncture "and other pain management procedures" (R. 285).

On October 24, 25, 26, 29, 30, 2007; November 1, 5, 15, and 20, 2007, Plaintiff was treated by a chiropractor at First Priority Medical Choice (R.293-314).

On November 20, 2007, Amanda Collier, D.C., First Priority Medical Choice, reviewed a "radiographic report" of Plaintiff's lumbar spine and pelvis. It showed "continued fractures at the bilateral acetabulum and inferior ramus of the pubic bones. These structures have cloudy densities around them and appear to be in the healing stages. The fractures appear to be further along in the healing stages than the previous radiographs. There is no sign of any new fractures or dislocations. The acetabular joints are well maintained" (R. 281).

Plaintiff completed a First Priority Medical Choice chiropractic "'Activities of Daily Living'" form on November 20, 2007. She reported she was able to "look after" herself, but "it cause[d] extra pain." Plaintiff wrote she realized very little relief from pain medication; she could not lift anything; she used a cane or crutches to ambulate; she could sit or stand for one-half hour; pain awakened her after less than two (2) hours of sleep; her sex life was normal, but caused pain; her social life was restricted due to pain; and she could travel for less than one hour (R. 293). Plaintiff reported she had difficulty vacuuming, sweeping, taking out garbage, window washing, carry large/heavy purse,

gardening, mowing lawn, doing yard work, washing or waxing vehicles, kneeling, squatting, caring for children, doing laundry, loading or unloading the dishwasher, shoveling snow, and sitting for long periods of time. Plaintiff reported she had partial difficulty dressing, making a bed, and engaging in sex. Plaintiff reported she had no difficulty bathing, showering, washing/drying her hair, going to the toilet, performing desk work, performing computer work, ironing, and reading (R. 294).

On November 26, 2007; January 24, 25, 28, 2008; and March 4, 2008, Plaintiff was treated by a chiropractor at First Priority Medical Choice (R. 288-92).

On March 26, 2008, Michael L. Mick, a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour work day and push/pull unlimited (R. 340). Plaintiff could never climb ladders, ropes or scaffolds. Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (R. 341). Plaintiff had no manipulative, visual or communicative limitations (R. 342-43). Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards. Plaintiff was found to be unlimited in her exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation (R. 343).

On April 2, 2008, Joseph Kuznair, Ed.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had no medically determinable impairment (R. 347). Dr. Kuznair noted Plaintiff's psychiatric condition was normal in September, 2007; she medicated with Klonopin, but had "no psych" diagnosis; she reported anxiety in August, 2007, due to fall; Plaintiff's activities of daily living show no "marked psych limitations"; "there [did] not appear to be a psych issue/severe

11

psych limitation"; and Plaintiff's Adult Functional Report did not contain a "report [of] functional limitation associated with anxiety"(R. 359).

On April 20, 2008, Dr. Ambroz completed a Physician's Summary of Plaintiff. He opined Plaintiff's prognosis was poor, she was disabled, her disability would last one year, and she could not care for children under the age of six (R. 361). Dr. Ambroz also opined Plaintiff could not be in a classroom setting, engage in any community or volunteer work, or engage in any employment. Dr. Ambroz made no findings as to Plaintiff's lifting, sitting, standing, bending, or walking limitations. He made no finding as to there being a psychological consideration that "need[ed] to be addressed with" Plaintiff (R. 362).

On April 23, 2008, Plaintiff reported to a physician at First Priority Medical Choice that she "need[ed] referral" to a pain management physician because she was in constant pain and her doctor was "unwilling to write any pain meds." Plaintiff was prescribed Toradol (R. 444).

On April 30, 2008, Plaintiff was treated at First Priority Medical Choice for dizziness, which, she stated, was caused by Lyrica. Plaintiff was prescribed Percocet and instructed to continue medicating with Lyrica (R. 443).

On May 5, 2008, Plaintiff presented to Shenandoah Community Health Center/Women's Health for obstetric care. Plaintiff reported she had a history of anxiety and depression, but she was stable "right now" R. 459).

On June 2, 2008, Plaintiff presented to Shenandoah Community Health Center/Women's Health with complaints of "depression, severe pain, life stressors, concerns about vaginal delivery, and swelling and pain in legs." She reported she was "smoking 'more than usual.'" She stated she had not been evaluated by an orthopaedic doctor for her pain; Plaintiff was instructed to "get a list

12

of ortho providers" from Medicaid and seek care (R. 459).

On June 4, 2008, Plaintiff underwent an ultrasound of her lower extremity deep veins; the results were normal (R. 462).

Plaintiff's urine drug screening was positive on June 10, 2008, "even though [Plaintiff] denied taking anything" (R. 459).

On June 17, 2008, Plaintiff reported to Shenandoah Community Health Center/Women's Health for an obstetric visit. Plaintiff reported "constant pain" in her hips. Plaintiff stated she had medicated with "some 'old Rx for Oxycodone'" when asked about her positive urine drug screening. It was noted that Plaintiff had not obtained blood work or made an appointment with an orthopedist, as she had been instructed to do. Lortab was prescribed for pain (R. 459).

On July 8, 2008, Plaintiff presented to Shenandoah Community Health Center/Women's Health with complaints of "severe pain." Plaintiff reported she was scheduled to be treated for pain by Dr. Draper in one month. Plaintiff stated that the "last midwife gave [her] pain meds that were suppose to last until [she] saw Dr. Draper . . . ." She asked if she could "get more" pain medication (R. 458). Plaintiff was prescribed a one-week's supply of Lortab and instructed to be treated by her "previous providers" for pain management (R. 459).

On July 21, 2008, Plaintiff reported to the emergency department of City Hospital with complaints of ear pain and left hip pain. Plaintiff reported she medicated with Klonopin and OxyContin. It was noted that Plaintiff "presented with the story that she was out of her medications and had been out of medications for a 'couple weeks.' However, drug screen revealed that the patient had recently taken opiates, benodiazepines and marijuana." Plaintiff smoked. Upon examination, Dr. Williams found Plaintiff was a "well-developed, pregnant . . . female who [was] alert, appears in no acute distress." Dr. Williams noted that he had "made a Board of Pharmacy

13

inquiry which interestingly enough did not have any medications listed on it which [he] found to be quite curious if she [was] indeed maintained on narcotics." Dr. Williams refused to prescribe narcotics to Plaintiff because of her October, 2007, statements that she was not taking narcotics, but she tested positive for them; the information from the Board of Pharmacy; and her pregnancy. Dr. Williams instructed her to have her obstetrician "coordinate" her narcotic prescriptions. He prescribed corticosporin for her ear condition. Dr. Williams observed that Plaintiff "ambulated out of the Emergency Department with no limp whatsoever" (R. 487-88).

On August 7, 2008, Plaintiff presented to Dr. John Draper, orthopedic surgeon, to "see if her injuries [would] cause any problems with her delivery"; Plaintiff was pregnant with her third child and due to deliver in November, 2008. Upon examination, Dr. Draper found tenderness to palpation in the lumbosacral spine area. Plaintiff's forward flexion was limited "somewhat by her pregnancy." Plaintiff had full range of motion of both hips; there was no effusion in either knee; her peripheral pulses were good; and there was no motor or sensory deficit. Plaintiff's straight leg raising test produced back and leg pain; Plaintiff had pain when Dr. Draper "stress[ed] the pelvis with various maneuvers." Dr. Draper prescribed Oxycontin for pain, which he was "going to have to . . . monitor[] closely." Dr. Draper requested Plaintiff provide x-rays since she was pregnant and could not have any made (R. 447).

In an addendum to Dr. Draper's August 7, 2008, medical report, he noted he had reviewed Plaintiff's x-rays and found the pelvis fractures thereon did "not look like they would interfere with her having a normal vaginal delivery." Dr. Draper opined he "expect[ed] her pain to diminish after delivery" (R. 446).

On August 12, 2008, Plaintiff presented to the Shenandoah Community Health

Center/Women's Health with complaints of "intense pain." Plaintiff reported Dr. Draper had prescribed thirty tablets of Oxycodone on August 7, 2008, to her, and she was to take one, every four (4) to six (6) hours; Plaintiff stated she had "taken them all and . . . need[ed] more." Plaintiff was informed that nurse/midwives could not prescribe Oxycodone and that Plaintiff would have to return to Dr. Draper for a refill of that prescription. Plaintiff requested that she be "transferred to MDs because . . . they [would] write her the scripts for these medications." Plaintiff was "informed . . . that MDs will need to see records from Dr. Draper . . ." (R. 458).

Dr. Draper prescribed Oxycodone to Plaintiff on August 13 and 26; September 10, 24; and October 8, 2008 (R. 448).

On August 20, 2008, a Disability Determination Examination of Plaintiff was completed by the West Virginia Disability Determination Service. Plaintiff reported to Robert F. Webb, M.D., that she'd "fractured her pelvis in seven places, her left hip, and her tailbone." Plaintiff reported she was seven (7) months pregnant. She stated she experienced continued pain in her "left lateral hip area, low back radiating up into the mid back, into the left lateral hip, and left groin areas." Plaintiff reported difficulty climbing stairs, doing housework, and "with normal everyday activities." Plaintiff reported difficulty falling asleep because she could not "get comfortable and at most g[ot] three or four hours of sleep a night." Plaintiff reported stiffness. Plaintiff reported she ambulated without a cane and could walk one-half of a city block (R. 363).

Plaintiff reported she had medicated with morphine, OxyContin, Ultram and Lyrica; she mediated with Oxycodone 5mg at the time of the evaluation. Plaintiff reported she had worked as an orthodontic technician until March, 2007, then she took "off and go on vacation." Plaintiff's weight was one-hundred, seventy (170) pounds. Plaintiff reported feeling "bloated with the pregnancy." She reported "aching pain in her left foot . . ., shooting pains down her left leg and into

the left groin area . . ., [and] some numbness and paresthesias in the left buttock down into the posterior thigh" (R. 364).

Upon examination, Plaintiff was "tender on the left groin, the lumbar spine, the left flank, the left iliac crest, and less so over the left lateral hip to palpation."  Plaintiff sat and rose from a chair "awkwardly to try to avoid weightbearing on her left leg."  Plaintiff had no edema, good "DP" pulses, negative straight leg raising test, and "good brisk knee reflexes and 1+ ankle reflexes" (R. 364).  Plaintiff was unable to squat, could not walk on her heels or toes, had difficulty getting up on and down from the examination table, "but was able to do this without help" (R. 364-65). Plaintiff's gait was stable. Plaintiff's upper extremities were normal.  She had normal fine manipulation with fingers.  Plaintiff's left knee flexion was one-hundred, twenty (120) degrees, left hip flexion was seventy (70) degrees, left hip abduction was twenty (20) degrees, left hip adduction was ten (10) degrees, left ankle dorsiflexion was ten (10) degrees, lumbar spine flexion was seventy (70) degrees, and lateral flexion of the lumbar spine was ten (10) degrees.  Plaintiff had mild weakness of the left lower extremity.  Dr. Webb opined that "[o]herwise, her range of motion of the lower extremities was clear" (R. 365). Dr. Webb reviewed "a note from her chiropractor, Dr. Chambers," and "notes from the University of Maryland Orthopedic Center," which included a CT scan of Plaintiff's pelvis. Dr. Webb's impressions were chronic pain syndrome, caused from the injuries sustained in the August, 2007, fall; stress incontinence; and tobacco abuse (R. 365).

On September 6, 2008, Dr. S. Park completed a Physical Residual Functional Capacity Assessment of Plaintiff.  Dr. Park found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour work day and push/pull unlimited

(R. 370). Plaintiff could never climb ladders, ropes or scaffolds. Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (R. 371). Plaintiff had no manipulative, visual, communicative, or environmental limitations (R. 372-73).

On September 9, 2008, Joseph A. Shaver, Ph.D., "reviewed all pertinent information in case file" and "affirmed" the April 2, 2008, opinion contained in the Psychiatric Review Technique assessment by Dr. Kuznair (R. 368).

On September 15, 2008, L. Fraine, C.N.M., noted that Plaintiff failed to appear for her last two appointments at the Shenandoah Community Health Center/Women's Health (R. 458).

On October 6, 2008, Dr. Draper noted that he had informed Ms. Griffin, "one of the midwives who [was] familiar with [Plaintiff] and told her that just based on her x-rays, [he] had not found any reason why her pelvic fractures would interfere with a vaginal delivery although there might be other non-orthopedic factors to consider." Ms. Griffin informed Dr. Draper that Plaintiff had also requested pain medications from her; Dr. Draper informed Ms. Griffin that he prescribed Oxycodone "on a set basis" to Plaintiff (R. 446).

Dr. Draper prescribed Oxycodone to Plaintiff on October 21, November 4, and November 20, 2008 (R. 446).

On November 3, 2008, Plaintiff presented to City Hospital with complaints of pain. She stated she "desir[ed] [C]esarean birth rather than vaginal birth, but [understood] Dr. Draper felt no orthopedic contraindication to vaginal birth" (R. 458).

Plaintiff did not keep her November 4, 2008, pre-labor induction appointment at Shenandoah Community Health Center/Women's Health (R. 458).

Plaintiff was evaluated on November 5, 2008, at Shenandoah Community Health

17

Center/Women's Health for her labor induction, which was scheduled for November 7, 2008. Plaintiff requested anti-anxiety drugs because she was "needle [] phobic"; she was informed that her being medicated with anti-anxiety drugs was "probably not possible" (R. 458).

On November 6, 2008, Dr. Draper telephoned the Shenandoah Community Health Center/Women's Health to "clarify that he did not think [Plaintiff's] pelvis would cause problems during a vaginal delivery" (R. 458).

On November 9, 2008, Plaintiff was discharged from City Hospital after having given birth and undergone a postpartum bilateral tubal occlusion.  She was in "stable condition."  Plaintiff complained of continued pain, which was diagnosed as a "combination of her chronic pain . . . and appropriate postoperative pain."  Dr. Cruden-Parham prescribed Percocet (R. 484).

On November 12, 2008, Plaintiff presented to Dr. Draper.  He noted Plaintiff had delivered a baby on November 7, 2008.  He wrote that Plaintiff "had called to get her records and  x-rays because she was talking about just showing up at Winchester to deliver because she was mad at the people here and [he] emphasized to her and [he] had [his] staff emphasized to her that this [was] a really bad idea and she finally went ahead and had the baby here.  Everything went fine and she was able to have a vaginal delivery. . . .  She is still pretty miserable and complaining of numbness down her entire left leg as well as low back pain.  Her exam today [was] consistent with a lumbar radiculopathy but in some ways it's not . . . ."  Dr. Draper ordered a CT scan of Plaintiff's lumbosacral spine.  Dr. Draper further opined that he "[thought] as she recover[ed] from her delivery, she [was] going to do a lot better."  He prescribed Celebrex and Skelaxin (R. 445, 500).

On December 1, 2008, Plaintiff was evaluated by Tressie M. Duffy, M.D., of West Virginia Weight and Wellness, for pain management.  Plaintiff reported her pain was chronic; located in her

left hip, leg, and lower back; and had been aggravated by her recent pregnancy and delivery. Plaintiff

informed Dr. Duffy that she experienced stiffness "all the time" and she had numbness and tingling

in her left thigh. Plaintiff reported she medicated with Oxycodone and requested a prescription for

Klonopin. Plaintiff reported Cymbalta "didn't work." Plaintiff reported she had had a "long standing

mood disorder that ha[d] been difficult to control with rough times in [her] teenage years" (R. 449).

Upon examination, Dr. Duffy noted Plaintiff was alert and in no acute distress. Dr. Duffy's

examination of Plaintiff's eyes, ears, noses, mouth, throat, respiratory system, cardiovascular system,

and gastrointestinal system produced normal results (R. 450). Plaintiff was grossly oriented, times

three; her mood was normal; her affect was appropriate (R. 450-51). Dr. Duffy's assessment was

as follows: adjustment reaction with prolonged depressive reaction; adjustment reaction with anxious

mood; moderate left osteoarthritis; chronic pain syndrome; chronic pain due to trauma; and

unspecified insomnia. Dr. Duffy prescribed Clonazepam, Cymbalta, Ibuprofen, and Oxycodone.

She ordered a pelvic CT scan. Dr. Duffy recommended Plaintiff undergo physical therapy (R. 451).

Plaintiff was prescribed Oxy IR by Dr. Draper on December 9, 2008 (R. 500).

On December 22, 2008, Plaintiff reported to Shenandoah Women's Health Center/Women's

Health for a postpartum evaluation, which was conducted by Anna Kent, C.N.M. Plaintiff reported

she was divorced and had "many life stressors at this time." She stated she had "chronic hip pain

which [was] better since delivery but still present." Plaintiff reported to Nurse Kent that she

medicated with Oxycodone, Motrin, Flexeril, Cymbalta, and Phenergan. Nurse Kent noted Plaintiff

was in no distress (R. 454). Nurse Kent observed Plaintiff experienced "[n]o unusual anxiety or

[showed] evidence of depression." Nurse Kent encouraged Plaintiff to "consider hydrotherapy for

pain" (R. 455).

On February 19, 2009, Dr. Draper noted Plaintiff had returned to his care "for the first time since November 12." Dr. Draper reported that Plaintiff had been "[t]aken on as a new patient by Tressie Duffy around the 1st of December but apparently it was found that she had gotten medicine from me and Dr. Duffy dropped her as a patient since this was in violation of their Pain Agreement." Plaintiff stated she "never got any medicine from" Dr. Draper on December 9 and insisted she had "abided by the Pain Agreement." Dr. Draper noted that neither he nor his staff was able to "find any evidence that this prescription that we have a record of was ever filled anywhere in this area." Dr. Draper found Plaintiff's physical finders were the same; he opined that he "[thought] as her body [got] back to normal after childbirth, she should start to feel better." Dr. Draper wrote that he would communicate with Dr. Duffy's office and he hoped she would take Plaintiff back as a patient (R. 499). Dr. Draper prescribed Percocet (R. 500).

On March 3, 2009, Dr. Draper prescribed Percocet to Plaintiff (R. 500).

On March 5, 2009, Dr. Draper wrote a letter to Dr. Duffy, asserting therein that Plaintiff had telephoned his office in December, 2008, and requested a prescription for medication, which he wrote, and which was "picked up" by someone. Dr. Draper wrote that he recognized that Plaintiff had, at the time she requested the prescription from him in December, 2008, "entered into some sort of medication agreement with" Dr. Duffy. Dr. Draper noted that, after a careful search, [he had] not been able to find that the [December, 2008] prescription was ever filled anywhere." He informed Dr. Duffy that he believed Plaintiff was "telling the truth about this." He also informed Dr. Duffy that "[s]ince [Plaintiff] was not seeing [Dr. Duffy] when she saw [Dr. Draper] on February 19, [he] did give her #50 Percocet and on March 3, [he] gave her #50 more." Dr. Draper wrote that if Dr. Duffy would "reassume [Plaintiff's] care for pain management, [he] [would] definitely not write her any more narcotic prescriptions" (R. 498).

20

In an undated letter to Plaintiff's lawyer, nicola michael c. Tauraso, M.D., wrote that Plaintiff had been Dr. Tauraso's patient since March 28, 2009.  Dr. Tauraso "involvement consist[ed] of medical management of [Plaintiff's] pain and depression."  Dr. Tauraso noted Plaintiff was "on long-term narcotic medication for pain control" (R. 501).  On March 28, 2009, Dr. Tauraso prescribed Oxycodone and Clonazepam to Plaintiff (R. 503).

The April 3, 2009, x-ray of Plaintiff's lumbar spine showed "[n]o acute findings." Degenerative disk disease at L4-5 and L5-S1 and right L4-5 facet arthropathy were noted (R. 497).

On April 17, 2009, Dr. Tauraso noted he would refer Plaintiff to an orthopaedic surgeon for an reevaluation.  He prescribed Clonazepam and Oxycodone to Plaintiff (R. 503).

Dr. Tauraso prescribed Clonazepam and Oxycodone to Plaintiff on May 8, 2009.  He noted she would be "seeing Dr. Draper on 5/21" (R. 503).

Dr. Tauraso prescribed Oxycodone and Clonazepam to Plaintiff on June 6, 2009 (R. 503).

On June 16, 2009, Plaintiff reported to the City Hospital emergency department with complaints of back pain.  Plaintiff reported she had "got[ten] into a fight" and had sustained a bite on her left hip and had been struck in her left back.  Dr. Ellis noted Plaintiff was "sound asleep" when he entered the examining room and he had to "[]wake her and stimulate her to get a history and examine her" (R. 476).  It was noted that Plaintiff appeared "'high'" (R. 482). Plaintiff reported she medicated with Soma, Oxycodone, and "anxiety medicine."  Plaintiff stated she was "taking" Suboxone, which she obtained "from a friend."  Plaintiff reported no "abnormal pain"; she had "[no] other complaints."  Upon examination, Dr. Ellis found Plaintiff was in no distress, was "extremely somnolent, very difficult for her to stay awake," had no pain on palpation of the cervical, thoracic or no specific lumbar spine tenderness to palpation with some slight soft tissue swelling and

21

asymmetry of the left paraspinal muscles and are in the flank." All of Plaintiff's reflexes were symmetrical; she had no pain with axillary compression or movement of her hips (R. 476). Her gait was steady (R. 482). Plaintiff's bite wound was treated and she was released (R. 476, 480).

Dr. Tauraso prescribed Oxycodone and Valium to Plaintiff on July 6, 2009 (R. 502).

On July 24, 2009, Plaintiff reported to Dr. Draper that her "life [had] been fairly turbulent and there [was] still some confusion about her pain management." Plaintiff reported pain in her pelvis, which radiated to her left foot. Plaintiff reported numbness in both hands. Dr. Draper found Plaintiff had "no concrete motor or sensory deficit and [her] pelvis seem[ed] stable." Plaintiff had "mildly positive Tinels and Phalens test in both hands." He found "nothing to suggest a cervical radiculopathy." Plaintiff's hip motion was good; her straight leg raising test on the left was equivocal. Dr. Draper found Plaintiff's deep tendon reflexes were "difficult to evaluate." Dr. Draper reviewed x-rays of Plaintiff's pelvis, which showed that "the hip joints both look[ed] good and the pelvis [was] healed in good position." Dr. Draper noted Plaintiff's lumbosacral spine x-ray showed narrowing and spurring at L5-S1. Dr. Draper's medical decision was as follows: bilateral carpal tunnel syndrome; healed pelvis fracture; and possible lumbar radiculopathy of her left leg. Dr. Draper noted Plaintiff was "looking into other options for pain management." Dr. Draper provided Plaintiff a prescription for bilateral wrist splints (R. 499).

Dr. Tauraso prescribed Valium and Oxycodone to Plaintiff on August 3, 2009 (R. 502).

Dr. Tauraso prescribed Valium and Oxycodone to Plaintiff on September 3, 2009 (R. 502).

<u>Administrative Hearing</u>

Plaintiff testified at the administrative hearing that she last worked in January and February, 2008, for "maybe three to four weeks" as an orthodontic technician, for which she "work[ed] at a

22

desk, answer[ed] phones, computer work and . . . other jobs" (R. 30).  Plaintiff testified she did not perform her work "very fast," was on medication, was tired and was fatigued.  Plaintiff stated it was difficult for her to sit and she would have to stand up."  Plaintiff testified she voluntarily left that employment because she thought it "was just a little too soon" to work and she "needed to try to take care of [her] family" (R. 31). Plaintiff described her pain as eight (8) or ten (10) on a scale of one-to-ten (1-10) (R. 33).  Plaintiff stated she would have to rise "maybe three or four" times in an hour from the seated position (R. 31-32).  Plaintiff testified she medicated with Oxycodone and Valium (R. 33).  Plaintiff stated she did not wear a brace or any orthopedic device (R. 34).

Plaintiff testified that her symptoms were the same as they were in January and February, 2008 (R. 31).  Plaintiff described her pain as feeling as if she'd been "hit with a baseball bat in [her] spine."  Plaintiff testified she felt pressure on her tail bone.  Plaintiff stated that it felt like there were a "couple buckets of bricks sitting" on her lower back (R. 32).  Plaintiff stated she no longer medicated with Cymbalta and that she had a history of "some depression," which had worsened (R. 33).  Plaintiff had never been hospitalized for depression (R. 38).  Plaintiff testified she had "crying spells" three (3) or four (4) times per week; she medicated with Valium.  Plaintiff testified she was treated for depression by her primary care physician; not a psychiatrist (R. 47-48).  Plaintiff reported pain that radiated to her feet, bilaterally.  She stated her arms and hands "hurt" and described her pain as extending to her shoulders and as "a gnawing[] ache, heavy" (R. 42-43). Plaintiff reported she experienced swelling in her feet, hands and ankles (R. 42).  Plaintiff stated she experienced spasms and discomfort (R. 43).  Plaintiff testified she had difficulty sleeping.  Plaintiff testified she "probably" slept for three (3) hours during the day and three (3) or four (4) hours during the night. Plaintiff stated she was awakened by pain (R. 47).

Plaintiff testified she no longer drove because she had lost her license due to a driving under the influence charge (R. 34). Plaintiff testified the father of her ten (10) month old baby did "a lot" to care for the infant. Plaintiff testified she could dress herself, prepare meals, but she did not often pick up and carry her ten (10) month old baby (R. 35). Plaintiff testified her twelve (12) year old daughter did "a lot" for her and for the baby (R. 40). Plaintiff stated she could "not really" bathe the baby (R. 41). Plaintiff described the vaginal birth of her baby as "terrible" and she felt "tortured." Plaintiff testified that she could stand for ten (10) minutes and could walk for ten (10) minutes (R. 36). Plaintiff stated she could lift a gallon of milk. Plaintiff testified that she lay down or reclined in a reclining chair for three (3) or four (4) hours per day (R. 37).

The ALJ asked the following hypothetical question to the VE:

Assume a person's reduced to sedentary residual functional capacity with the following limitations, has to arise from a seated position about three or four times an hour in place for a brief period of time because of a tailbone injury. I'm going to mimic the DDs' (sic), only occasional heights, steps or use of hazardous machinery, likewise occasional exposure to temperature extremes. Let's stay away from squatting, crawling or kneeling because of the residuals of the injury to the tailbone. Let's keep it entry-level or unskilled positions that can understand, remember and carry out simple instruction. What, if any, jobs exist for an individual with those limitations? (R. 45).

The VE responded that such a hypothetical person could do the work of a grading and sorting worker, 29,000 jobs in the national economy and 340 in the local economy; the work of an inspector, 32,000 jobs in the national economy and 450 jobs in the local economy; and the work of a table worker, 37,000 jobs in the national economy and 580 jobs in the local economy (R. 45-46).

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Pace made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2012 (R. 20).

2.  The claimant has not engaged in substantial gainful activity since August 25, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*) (R. 20).

3.  The claimant has the following severe impairments: residuals of pelvic fractures (no surgery), an organic pain syndrome, and degenerative disc disease of the lumbosacral spine with radiculitis (20 CFR 404.1520(c) and 416.920(c)) (R. 20).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 22).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). Specifically, she can lift ten pounds frequently, sit for six hours in an 8-hour workday, but must be able to rise 3-4 times within the hour in place; and stand/walk for periods of up to two hours in an 8-hour workday from an exertional standpoint. Nonexertionally, she is capable of understanding, carry out, and remembering simple instructions. She can occasionally tolerate climbing steps, crouching, working at heights and around hazardous machinery. She can tolerate occasional exposure to temperature extremes. She cannot tolerate tasks requiring crawling, kneeling, and squatting due to her musculoskeletal impairments (R. 22).

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965) (R. 24).

7.  The claimant was born on May 24, 1974 and was 33 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1573 and 416.963) (R. 24).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964) (R. 24).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 24).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)) (R. 24).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 25, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)) (R. 25).

## IV.  Discussion

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'"  *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B.  Contentions of the Parties

The Plaintiff contends:

1.     The Administrative Law Judge erroneously assessed the Plaintiff's residual functional capacity.

2.     The Administrative Law Judge erroneously assessed the Plaintiff's credibility.

The Commissioner contends:

1.     The ALJ properly assessed Plaintiff's RFC.

2.     The ALJ properly assessed Plaintiff's credibility.

## C.  RFC

Plaintiff argues that the ALJ failed to properly assess the Plaintiff's limitations in formulating Plaintiff's RFC. Plaintiff concedes that the ALJ performed a function-by-function assessment of her ability to perform the exertional and non-exertional requirements of work, but argues 1) the ALJ failed to set forth a narrative discussion setting forth how the evidence supports each conclusion, failed to discuss Plaintiff's ability to perform sustained work activities, and failed to discuss the maximum amount of each work-related activity Plaintiff could perform; and 2) failed to properly evaluate pertinent evidence (Plaintiff's brief at p. 6). Plaintiff cites SSR 96-8p in support of his contention.  SSR 96-8p provides, in pertinent part:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

A review of the ALJ's decision shows he complied with the Ruling.  He discussed the medical facts and nonmedical evidence that supported his RFC.  He also discussed Plaintiff's ability to perform

27

sustained work activities and the maximum amount of work-related activity Plaintiff could perform.

The ALJ's RFC was as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). Specifically, she can lift ten pounds frequently, sit for six hours in an 8-hour workday but must be able to rise 3-4 times within the hour in place; and stand/walk for periods of up to two hours in an 8-hour workday from an exertional standpoint. Nonexertionally, she is capable of understanding, carrying out, and remembering simple instructions. She can occasionally tolerate climbing steps, crouching, working at heights and around hazardous machinery. She can tolerate occasional exposure to temperature extremes. She cannot tolerate task requiring crawling, kneeling, and squatting due to her musculoskeletal impairments (R. 22).

As evidenced above, Plaintiff's RFC contains the ALJ's findings as to Plaintiff's sustained work activities and the maximum amount of work-related activity she could perform. The ALJ's RFC is not "an unsupported conclusion" as Plaintiff argues (Plaintiff's brief at p. 6). The ALJ discussed the evidence of record relative to Plaintiff's limitations in formulating his RFC. He discussed the medical records submitted by Dr. Webb, the nurse/midwives at Shenandoah Community Health Center/Women's Health, physicians who treated Plaintiff after the August, 2007, fall, and Plaintiff's own statements. Specifically, the ALJ discussed and considered Dr. Webb's August, 2008, opinion that Plaintiff had no "significant abnormalities or significant limitations in the ability to engage in work-related activities except that she was left with a chronic pain syndrome." The ALJ discussed and considered the evidence relative to Plaintiff mental health condition, specifically finding that Plaintiff's "alleged depression with anxiety has no more than minimal effect on . . . ability to function" (R. 21). The ALJ discussed and considered Plaintiff's statements about what she could do. He noted she had returned to work and worked for "3-4 weeks." He discussed and considered her statements that she could sit, but needed to rise three (3) or four (4) times per hour; she could stand for ten minutes; she could walk for ten minutes; she could lift a

28

gallon of milk. He discussed and considered Plaintiff's ability to perform "ordinary household chores," prepare meals, shop for groceries, talk with friends on the telephone, and dress herself. He discussed and considered Plaintiff's ability to engage in gross movements and ambulate (R. 23). The ALJ discussed and considered the findings of the state agency physicians and psychological consultant, who each made specific findings as to Plaintiff's ability to perform work activities (R. 24). The ALJ discussed and considered Plaintiff's pregnancy and vaginal delivery of a baby in November, 2008; her normal range of motion and straight leg raising tests in August, 2008; diagnostic findings that "reflect no acute processes or indications of a tissue injury" and show no "dysfunction in the nervous system" (R. 21, 23). The ALJ also noted that his RFC was based on and supported by the evidence of record as to "the nature of [Plaintiff's] treatment, [Plaintiff's] response to treatment, and the [Plaintiff's] level of function including sexual, social, and employment since the onset date" (R. 24).

The record contains the opinion of Dr. Ellis, who, on October 19, 2007, found Plaintiff had no pain of her cervical spine, thoracic spine, or lumbar spine on palpation. Plaintiff had only "mild pain on palpation of her paraspinal muscle." Plaintiff's lower extremity strength, sensory, and reflexes were symmetrical (R. 493-95). Dr. Ambroz, on October 23, 2007, found no weakness, no tenderness, no spasm, good ranges of motion in her cervical spine, good ranges of motion in all joints in her extremities, no atrophy, no clubbing, and full peripheral pulses (R. 333). On August 7, 2008, Dr. Draper found Plaintiff had full range of motion of both hips, no effusion in either knee, good peripheral pulses, no motor or sensory deficit and Plaintiff could deliver her baby vaginally (R. 446, 447). On December 22, 2008, Plaintiff stated to Nurse-Midwife Kent that she experienced "chronic hip pain which [was] better since delivery but still present" (R. 454). On June 17, 2009,

Dr. Ellis examined Plaintiff after she was involved in a fight.  She was in no distress, had no pain on palpation of the cervical or thoracic spine and had no lumbar spine tenderness to palpation. Plaintiff's reflexes were symmetrical, she had no pain with compression or movement of her hips. Her gait was steady (R. 476, 480).  On July 24, 2009, Dr. Draper found no "concrete motor or sensory deficit." Plaintiff's pelvis was stable. She had no cervical radiculopathy.  Her hip motion was good and straight leg raising test on the left was equivocal (R. 23).

Plaintiff also argues that the ALJ "failed to evaluate pertinent evidence," such as: Plaintiff's October 18, 2007, lumbar spine MRI; Dr. Draper's July 24, 2009, evaluation of Plaintiff's hands; Dr. Nascone's undated letter about Plaintiff's inability to work; Dr. Ambroz's April 23, 2008, opinion about Plaintiff's condition; and Dr. Duffy's December 1, 2008, mental health diagnosis (Plaintiff's brief at pp. 6-7).   Defendant contends that Plaintiff's argument is without merit (Defendant's brief at p. 8).  Plaintiff argues that the ALJ erred in his determination that Plaintiff had, based on her October 18, 2007, MRI of her lumbar spine, "degenerative disc disease, but no herniation" (Plaintiff's brief at p. 6).  (Emphasis omitted.)  Plaintiff asserts that Plaintiff's October 18, 2007, MRI "revealed disc herniations at L4-5 and L5-S1, which displaced the right S1 nerve root" (Plaintiff's brief at p. 6).  A review of this record shows the ALJ did not err in his evaluation of Plaintiff's MRI. The October 18, 2007, a MRI of Plaintiff's lumbar spine showed the following: "Broad-based degenerative disc *protrusion* at the L5-S1 level that is central and eccentric to the right, that displaces the right S1 nerve root and results in mild right neural foraminal stenosis. . . . A central to rightward disc *protrusion* at the L4-5 level which results in mild right lateral recess stenosis. . ." (R. 433). (Emphasis added.)  The ALJ's finding that Plaintiff did not have herniated disks is supported by substantial evidence.

Plaintiff argues that the ALJ "failed to evaluate . . . evidence" from Dr. Nascone, who wrote, in an undated letter, that Plaintiff would be unable to work for twelve months, and Dr. Ambroz's April 23, 2008, opinions that Plaintiff's prognosis was poor, her condition was expected to last for one year, "she could not care for children under the age of six," she could not be in a classroom setting, or participate in volunteer/community work, and could not become employed on either part-time or full-time basis (Plaintiff's brief at p. 6-7). The ALJ did review and evaluate the medical opinions of Dr. Nascone. Dr. Nascone was a physician at the University of Maryland Medical Center, who treated Plaintiff after her August, 2007, fall. Dr. Nascone examined Plaintiff on September 3, 2007 (R. 265, 266). The ALJ discussed Dr. Nascone's findings that Plaintiff was "non-weight-bearing on the left and weight-bearing as tolerated on the right"(R. 21). Dr. Nascone examined Plaintiff on September 11, 2007 (R. 262). The ALJ discussed his findings that Plaintiff was neurologically intact; her sensation was intact; her pulses were symmetric (R.21). Dr. Nascone examined Plaintiff on October 9, 2007 (R. 260). The ALJ discussed his findings that Plaintiff "gave poor effort with respect to manual motor testing" (R. 21).

Dr. Nascone, in an undated letter, reiterated his recommendation that Plaintiff "be nonweightbearing on the left side and weightbearing as tolerated on the right." Dr. Nascone also opined that he "suspect[ed]" Plaintiff would be "out of work for at least 12 months" (R. 278). The opinion expressed by Dr. Nascone relative to Plaintiff's one-year disability is an issue reserved to the Commissioner because it is an administrative findings that is dispositive of a case; *i.e.*, that would direct the determination or decision of disability. A statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine that the claimant is disabled. 20 C.F.R. § 404.1527(3)(1) expressly provides that the Commissioner "will

not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. §4041527(e)(1).

The undersigned makes the same finding as to the opinion of Dr. Ambroz. In his April 23, 2008, "Medical Review," he did not make any findings as to Plaintiff's lifting, sitting, standing, bending or walking limitations. His finding that Plaintiff was disabled and her disability would last for one year and that her disability prevented her from being in a classroom setting, caring for a young child, participating in volunteer activities, participating in community activities, or working full or part time are determinations that are reserved to the Commissioner.

Plaintiff next argues that the ALJ "did not evaluate [the] opinion" of Dr. Duffy that Plaintiff "suffered from an adjustment reaction with prolonged depressive reaction, as well as an adjustment reaction with anxious mood" (Plaintiff brief at p. 7). It is clear to the undersigned that the ALJ did consider this opinion. Dr. Duffy evaluated Plaintiff on December 1, 2008, for pain management. Dr. Duffy diagnosed Plaintiff with "[a]djustment reaction with prolonged depressive reaction" and "[a]djustment reaction with anxious mood"; however, Dr. Duffy found Plaintiff's mood was normal and her affect was appropriate, and she found no limitations that were caused by those conditions. Dr. Duffy prescribed, in addition to pain medications, Cymbalta and Clonazepam (R. 451). The ALJ evaluated Plaintiff's mental conditions in his decision. He noted that Plaintiff had a "treatment history for depression with anxiety for which treatment has consisted of medication in the past. There is no evidence of psychiatric hospitalizations or supportive psychotherapy. While the claimant alleges depression with anxiety, a review of the evidence indicated that her condition is controlled with medication and ongoing medical care. Nor does the record reflect any limitations of her daily

32

activities, social functioning, or concentration due to psychiatric impairments alone.  It is therefore concluded that her alleged depression with anxiety has no more than minimal effect on the ability to function . . ." (R. 21).  Even though the ALJ did not specifically name Dr. Duffy in this evaluation of the evidence, the above recitation demonstrates he considered her opinions. The ALJ "is not required 'to use a particular format in conducting his analysis,' but the decision must demonstrate 'there is sufficient development of the record and explanation of findings to permit meaningful review.'" *Moore v. Astrue*, 2010 WL 3394657, *6 n.12 (E.D. Va. July 27, 2010) (quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3rd Cir. 2004)).

Finally, the Plaintiff argues that the ALJ "failed to evaluate" the evidence of Dr. Draper "in any manner" (Plaintiff's brief at p. 6).  Specifically, Plaintiff asserts that the ALJ failed to evaluate the July 24, 2009, carpal tunnel diagnosis of Dr. Draper. As noted by Defendant, "[t]he ALJ is not required to give an exhaustive discussion of all the exhibits.  'Consideration of all the evidence does not mean that the ALJ must explicitly refer to each and every exhibit in the record.'" *Mays v. Barnhart*, 227 F.Supp.2d 443, 448 (E.D. Pa. 2002), aff'd 2003 WL 22430186 (3rd Cir. October 27, 2003, *petition for hearing en banc denied*. (Defendant's brief at pp. 8-9). The ALJ may have failed to note Dr. Draper's diagnosis of bilateral carpal tunnel syndrome, but he did evaluate the evidence as to Plaintiff's hands and upper extremities.

Dr. Draper examined Plaintiff on July 24, 2009.  Plaintiff stated she experienced numbness in both hands.  Dr. Draper noted Plaintiff had mildly positive Tinels and Phalens tests in both hands but "there [was] nothing to suggest a cervical radiculopathy."  Dr. Draper also noted that Plaintiff had "no concrete motor or sensory deficit."  Dr. Draper's "medical decision" was for bilateral carpal tunnel syndrome. He provided Plaintiff a prescription for wrist splints (R. 449). There is no evidence

that Plaintiff ever obtained the wrist splints, wore them, or experienced any relief of her hand symptoms because of them.  At the administrative hearing, Plaintiff did not testify that she she had been diagnosed with carpal tunnel syndrome or wore wrist splints.  She did not even testify she experienced hand numbness.  She testified that she had nerve damage from the August, 2007, fall, which caused, among other symptoms, her hands to swell and her to experience pain that extended from her hands to her shoulders.  Plaintiff described this pain as "a gnawing[ ] ache, heavy" (R. 42-3). Plaintiff did not testify that she experienced reduced strength or functional limitations in her hands. The ALJ considered this testimony (R. 23).

There is no evidence in the record that Plaintiff was evaluated or treated for carpal tunnel syndrome before or after Dr. Draper's July, 2009, medical decision; no follow-up examination occurred and no testing, such as a nerve conduction study, was ordered or occurred.  There was no evidence in the record that Plaintiff experienced any limitations in her hands or upper extremities. The ALJ found there was no "evidence of inability to perform fine and gross movements" and Plaintiff was "able to perform fine and gross movements" (R. 22, 23). The ALJ based this decision on the opinions and findings of those physicians who examined or treated Plaintiff, none of whom found any deficiencies in her hands or upper extremities that could have been caused by carpal tunnel syndrome.  First, and foremost, Dr. Draper made no findings as to any limitations that were caused by Plaintiff's numbness in her hands; therefore, the ALJ had no opinion from Dr. Draper to consider or evaluate in formulating his RFC. The ALJ considered Dr. Webb's August, 2008, examination of Plaintiff wherein he concluded that Plaintiff's upper extremities were normal and she had normal fine manipulation with fingers (R. 21, 23, 365).  During that examination, Plaintiff did not complain of any hand or upper extremity pain or limitations (R. 363-65).  The ALJ found, based on the opinion

34

of Dr. Webb, that Plaintiff had no "significant abnormalities or significant limitations" (R. 21). Additionally, the ALJ relied on the opinions of the state agency physicians, who found, in March and September, 2008, that Plaintiff had no manipulative limitations (R.24, 342-43, 372-73). The ALJ also noted that "[d]iagnostic findings reflect[ed] no acute . . . dysfunction in the nervous system" (R. 23). On August 26, 2006, Plaintiff was neurovascularly intact in her hands and her upper extremities ranges of motion were normal (R. 405). Plaintiff's motor strengths in her upper extremities and her hand grips were 5/5 on October 23, 2007 (R. 333). Plaintiff did not complain of hand numbness on June 16, 2009, when she reported to the City Hospital emergency department after a fight (R. 476, 480-82). Plaintiff did not report hand numbness to Dr. Tauraso, who prescribed medication to Plaintiff for pain five times from May 8, 2009, to September 3, 2009 (R. 502-03).

The ALJ also considered Plaintiff's activities of daily living relative to her hand numbness. He noted that she was capable of lifting a gallon of milk; performing "ordinary household chores including laundry"; preparing meals; shopping for groceries; caring for her children; assisting with homework; and dressing herself (R. 23). In November, 2007, Plaintiff reported she had no difficulty performing desk or computer work (R. 294).

The undersigned finds the ALJ's evaluation of Plaintiff's upper extremity functional limitations and abilities is sufficient and supported by substantial evidence. Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion." *Hays,* supra. The ALJ's discussion of Plaintiff's hands and upper extremities was brief but sufficient. Although he did not expressly state he considered the "medical decision" of Dr. Draper that Plaintiff had bilateral carpal tunnel syndrome, the undersigned finds the omission harmless because the ALJ's discussion is entirely consistent with the record. See *Morgan v. Barnhart,* 106 Soc. Sec. Rep. Serv. 456 (4th Cir.

2005), in which the Fourth Circuit found that an error committed by the ALJ was harmless, relying on *Ngarurih v. Ashcroft*, 371 F.3d 182 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which the action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.")

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's RFC determination.

## D. Credibility

Plaintiff asserts that the ALJ's credibility finding was "insupportable" (Plaintiff's brief at p. 10). The Defendant asserts that the ALJ properly assessed Plaintiff's credibility (Defendant's brief at p. 10). Specifically, Plaintiff lists the following nine errors committed by the ALJ in his credibility determination:

- The ALJ failed to support his finding that Plaintiff's treatment records do not reveal her pain was as severe as alleged (Plaintiff's brief at p. 10);

- The ALJ failed to correctly evaluate Plaintiff's alleged noncompliance with pain agreements (Plaintiff's brief at p. 10);

- The ALJ failed to explain his reasoning relative to his finding that Plaintiff's consumption of six beers prior to her August, 2007, fall led to his conclusion that Plaintiff's complaints of pain were less than credible (Plaintiff's brief at pp. 10-11);

- The ALJ failed to explain his reasoning relative to his finding that Plaintiff's leaving the emergency room to smoke cigarettes led to his conclusion that Plaintiff's complaints of pain were less than credible (Plaintiff's brief at p. 11);

- The ALJ's finding that "diagnostic findings reflect no dysfunction in the nervous system" is not supported (Plaintiff's brief at p. 11);

- The ALJ's finding that Plaintiff ambulates effectively is not supported by the

36

evidence (Plaintiff's brief at p. 11);

- The ALJ failed to consider Plaintiff's complaints of pain after she returned to work in January, 2008 (Plaintiff's brief at p. 11);

- The ALJ erred in relying on Plaintiff's pregnancy to find her complaints not credible (Plaintiff's brief at p. 12); and

- The ALJ's analysis of Plaintiff's activities of daily living is flawed (Plaintiff's brief at pp. 12-13).

The Fourth Circuit mandated the following protocol relative to the consideration and analysis of an individual's complaints of pain:

. . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). *Craig v. Chater,* 76 F. 3d 585, 594 (1996).

Additionally, 20 C.F.R. §404.1529(c)(3) reads as follows:

(c) *Evaluating the intensity and persistence of your symptoms, such as pain, and determining the extent to which your symptoms limit your capacity for work—*

(3) *Consideration of other evidence.* Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator

37

of the intensity and persistence of your symptoms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons. Section 404.1527 explains in detail how we consider and weigh treating source and other medical opinions about the nature and severity of your impairment(s) and any related symptoms, such as pain. Factors relevant to your symptoms, such as pain, which we will consider include:

> (I) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms (SSR 96-7p).

. . .

In his decision, the ALJ found the following:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extend they are inconsistent with the above residual functional capacity assessment (R. 23).

38

The evidence shows that the claimant has well healed compression fractures of the pelvic and secrum (sic). Dr. Webb has noted that she is left with a chronic pain syndrome however, based on treatment records, her pain is not as severe as alleged. She is prescribed narcotic medications with close monitoring and has been denied pain treatment in the past due to non-compliance with pain agreements. Treatment records reflect that the claimant had had six beers at the time of her fall. Two months after her fall, she sought emergency treatment for pain but she was observed to have gotten up and walked out to smoke cigarettes. Physical examinations have been essentially unremarkable except for occasional tenderness in various body parts. She is able to perform fine and gross movements and she ambulated effectively. Diagnostic findings reflect no acute processes or indications of any tissue injury that is expected to continue or progress; or dysfunction in the nervous system. While she does have some postural and environmental restrictions/limitations resulting from her musculoskeletal impairments, the evidence overall does not support the limitations alleged. She has required no surgical intervention. On consultative examination, Dr. R. Webb noted no significant limitations despite her pregnancy. According to therapy notes dated, (sic) November 26, 2007, the claimant reported that she felt better than she had in a long time and had returned to work by January, 2008. Treatment has been intermittent at best and she has had some compliance issues as when she was asked to obtain blood work and make an appointment with an orthopedist to which she did not comply. While the claimant does experience intermittent pain due to her impairments, the evidence of record does not support the pain and limitations alleged when compared with functioning since the onset date including pregnancy, work activity, and her admitted activities of daily living (R. 23-24).

A review of the record shows the ALJ complied with the mandates of *Craig*, supra, and 20 C.F.R. §404.1529(c)(3). Specifically, the ALJ considered and evaluated the objective medical evidence of record and Plaintiff's activities of daily living; her statements about the location, duration, frequency and intensity of her pain; the precipitating and aggravating factors that caused her pain; the medications she took and their effect; the treatment she underwent and measures she undertook, other than medication, to mitigate pain; and other factors relevant to Plaintiff's condition.

Relative to the ALJ's evaluation of the objective medical evidence of record and as noted above, Plaintiff specifically argues that 1) the ALJ failed to support his finding that Plaintiff's treatment records do not reveal her pain was as severe as alleged (Plaintiff's brief at p. 10); 2) the ALJ's finding that "diagnostic findings reflect no dysfunction in the nervous system" is not

supported (Plaintiff's brief at p. 11); and 3) the ALJ's finding that Plaintiff ambulates effectively is not supported by the evidence (Plaintiff's brief at p. 11).  The undersigned finds the ALJ's review and evaluation of the objective medical evidence is sufficient.

The ALJ concluded the following:  "Dr. Webb has noted that she is left with a chronic pain syndrome however, based on treatment records, her pain is not as severe as alleged"(R. 24).  This conclusion was not void of any explanation to support it, as Plaintiff argues, but was based on the ALJ's consideration and evaluation of the evidence provided by Dr. Webb, who found Plaintiff's pulses were good and she had no edema.  Plaintiff's straight leg raising test was negative.  She had good knee and ankle reflexes.  She could not squat or walk on her heels or toes.  Dr. Webb found Plaintiff's gait was stable.  Her range of motion in her upper extremities was normal; her fine manipulation was normal.  Dr. Webb found that other than Plaintiff's left knee having one-twenty (120) degrees of flexion; her left hip having seventy (70) degrees of flexion; her left hip abduction being twenty (20) degrees; her left hip adduction being ten (10) degrees; her lumbar spine flexion being seventy (70) degrees; and her lateral lumbar spine flexion being ten (10) degrees, Plaintiff's "range of motion of the lower extremities was clear."  Dr. Webb found that Plaintiff had only mild weakness of the left lower extremity  (R. 21).

The ALJ considered the findings of the state agency physicians, the objective evidence provided by Dr. Nascone, and Dr. Duffy's assessment (R. 21-24). On March 26, 2008, a state agency physician found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour work day and push/pull unlimited (R. 340).  Plaintiff could never climb ladders, ropes or scaffolds.  Plaintiff could occasionally climb ramps and stairs, balance,

stoop, kneel, crouch, and crawl (R. 341). Plaintiff had no manipulative, visual or communicative limitations (R. 342-43). Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards. Plaintiff was found to be unlimited in her exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation (R. 343). On September 6, 2008, another state agency physician made the same findings as noted above (R. 370-73). Dr. Nascone, on October 9, 2007, found Plaintiff was neurovascularly intact; her sensation was intact with "some hypersensitivity over the dorsum of her left foot"; her pulses were symmetric. Dr. Nascone opined Plaintiff had "poor effort with respect to manual motor testing." Dr. Nascone recommended Plaintiff engage in a "therapy program to help with her overall deconditioning" (R. 260). Dr. Duffy found Plaintiff was alert and in no acute distress; she was grossly oriented, times three; her mood was normal; her affect was appropriate (R. 450-51). Dr. Duffy's assessment was as follows: adjustment reaction with prolonged depressive reaction; adjustment reaction with anxious mood; moderate left osteoarthritis; chronic pain syndrome; chronic pain due to trauma; and unspecified insomnia. Dr. Duffy recommended Plaintiff undergo physical therapy (R. 451). As noted above, the record contains the opinion of Dr. Ellis's findings that Plaintiff had no pain of her cervical spine, thoracic spine, or lumbar spine on palpation; only "mild pain on palpation of her paraspinal muscle; and symmetrical lower extremity strength, sensory, and reflexes (R. 493-95). Dr. Ellis, during a subsequent examination, found Plaintiff was in no distress, had no pain on palpation of the cervical or thoracic spine and had no lumbar spine tenderness to palpation, had symmetrical reflexes, had no pain with compression or movement of her hips, and had steady gait (R. 476, 480). Dr. Ambroz found no weakness, no tenderness, no spasm, good ranges of motion in her cervical spine, good ranges of motion in all joints in her extremities, no atrophy, no clubbing, and full peripheral pulses

41

(R. 333).  Dr. Draper found no "concrete motor or sensory deficit."  Plaintiff's pelvis was stable.  She had no cervical radiculopathy.  Her hip motion was good and straight leg raising test on the left was equivocal (R. 23).  The ALJ's finding that Plaintiff's pain was not as severe as alleged is supported by objective evidence.

The ALJ evaluated the diagnostic evidence relative to Plaintiff's lumbar spine.  As discussed earlier in this document, the ALJ relied on the October 18, 2007,  MRI of Plaintiff's lumbar spine, which showed a broad-based disc protrusion at L5-S1 with displacement of the right S1 nerve root, which resulted in mild right neural foraminal stenosis, and a disc protrusion at L4-5 level, which resulted in mild right lateral recess stenosis (R. 433).  Plaintiff did not have herniated discs.

Plaintiff also argues that the ALJ failed to properly evaluate the objective medical evidence as to Plaintiff's ambulation.  The ALJ found Plaintiff "ambulates effectively."  Plaintiff testified she could walk or stand for ten minutes at a time (R. 36).  The ALJ considered that testimony (R. 23).  The ALJ considered the "diagnostic findings" that showed "no acute processes or indications of a tissue injury that is expected to continue or progress"; and no dysfunction of Plaintiff's nervous system (R. 23).  Plaintiff asserts that Plaintiff was diagnosed with "radiculopathy down her left leg ((Tr. 445)" (Plaintiff's brief at p. 11); however, a reading of that medical record shows that Plaintiff complained of "numbness down her entire left leg" and the "exam today [November 12, 2008] [was] consistent with a lumbar radiculopathy but in some ways it's not."  There was no finding of "radiculopathy down her left leg" as argued by Plaintiff.  Additionally, Plaintiff asserts Dr. Webb found she was "unable to stand from a chair without use of her arms" (Plaintiff's brief at p. 11).  That assertion is inaccurate.  Dr. Webb found Plaintiff was "unable to stand up from the chair with her arms held out."  Additionally, Dr. Webb found Plaintiff could get up on and down from the

examination table (R. 364-65).  As to ambulation, Dr. Webb found that Plaintiff's gait was stable.

Plaintiff informed Dr. Webb that she walked without a cane and she could walk about one-half city

block (R. 22-23, 363-65).  Plaintiff asserts that Dr. Webb found that Plaintiff "avoid[ed] weight

bearing on her left leg" when she sat down and stood up from the seated position; however, Dr.

Nascone, on October 9, 2007, opined Plaintiff could "be weightbearing as tolerated bilaterally" (R.

260).  In addition to the above, the ALJ relied on the medical opinions of the two state agency

physicians, who opined that Plaintiff could stand/walk for up to six hours in an eight-hour workday

(R. 24, 341, 371).  The record contains the observation of Dr. Williams, who, on July 21, 2008,

noted Plaintiff "ambulated out of the Emergency Department with no limp whatsoever" (R. 487-88).

Dr. Ellis found Plaintiff's gait was steady on June 16, 2009 (R. 482). Plaintiff's motor strength was

intact on October 18, 2007; she had no motor deficit on July 24, 2009 (R. 421-22, 499). The ALJ's

finding as to Plaintiff's ability to "ambulate effectively" is supported by the evidence of record.

Plaintiff contends that the ALJ failed to correctly evaluate Plaintiff's activities of daily living

because he failed to consider that Plaintiff's activities were not "performed on any type of sustained

basis" (Plaintiff's brief at p. 13).  The ALJ considered the following statements by Plaintiff:

> On activities of daily living, she lives in an apartment with her two daughters; 12
> years and a 10 month old baby.  She performs ordinary household chores including
> laundry.  She prepares meals and she shops for groceries.  She takes care of her kids
> and she assists with homework.  She visits with friends over the telephone.  Her
> baby's father does a lot to help because he has been out of work.  She can dress
> herself but she cannot give the baby a bath because the baby is slippery and heavy.
> She alleges that she is afraid that she will drop her. [Plaintiff] stated that when she
> has to lie down, the baby is tended by her father (Exhibits 15F and 19E (R.23).

Despite Plaintiff's argument, which she supports with findings contained in a decision rendered in

the District of Massachusetts, a decision which is not binding on this Court, the undersigned finds

the ALJ adequately evaluated Plaintiff's activities of daily living in making his credibility

determination. As noted above, Plaintiff could complete household chores, care for her children, assist her older daughter with homework, talk on the phone, prepare meals, and complete laundry. As noted throughout this decision, no physician, who evaluated or treated Plaintiff and on whom the ALJ relied, limited Plaintiff's activities of daily living. The ALJ considered the activities of daily living that Plaintiff stated she could perform in conjunction with the record of evidence; the evidence supports his finding that Plaintiff was not entirely credible.

The ALJ considered the location, duration, frequency and intensity of Plaintiff's pain. Plaintiff asserts that the ALJ failed to consider Plaintiff's levels of pain in the weeks during which she was employed in 2008. The undersigned disagrees. The ALJ specifically considered this evidence. He noted the following: "The claimant testified that since the onset date, she tried to return to work; that she worked 3-4 weeks but she had to quit. She worked as an orthodontic technician. She stated that it was too tough and that sitting was difficult. . . . On a scale of one to ten, her pain level is 8 - 10 with medication" (R. 20, 22-23). The ALJ did not find this testimony credible because it was not supported by the record of evidence and by Plaintiff's own testimony. Specifically, Dr. Webb's finding were that Plaintiff's pulses were good and she had no edema; her straight leg raising test was negative; she had good knee and ankle reflexes; her gait was stable; her range of motion in her upper extremities was normal; her fine manipulation was normal; she had mild weakness of the left lower extremity. Dr. Chambers, two months after Plaintiff's fall, listed her pain, during the "healing stages," as noted by the ALJ, as "only grade 2 pain in flexion and grade 3 pain on extension, left/right rotation, and grade 3 pain on right/left lateral flexion" (R. 21). The July 24, 2009, x-ray showed that "the hip joints both look[ed] good and the pelvis [was] healed in good position" (R. 499). Plaintiff's own testimony, at the administrative hearing, undermined her

44

credibility. She did testify that she voluntarily quit her job because she thought it "was just a little too soon" for her to return to work; however, she also stated that she quit her job because she "needed to try to take care of [her] family" (R. 31). Additionally, Plaintiff argues that the ALJ failed to evaluate Plaintiff's reporting to her physical therapist, in March, 2008, that she used a crutch two (2) or three (3) times weekly when she worked. As noted above, the ALJ thoroughly considered Plaintiff's ability to ambulate. Additionally, by the time Plaintiff was evaluated by Dr. Webb in August, 2008, she was not using any assistive device to aid her in ambulating (R. 363). The ALJ evaluated this evidence and it supports his finding that Plaintiff was not credible (R. 23).

Plaintiff contends the ALJ erred by relying on Plaintiff's beer consumption prior to her August, 2007, fall, cigarette smoking during an emergency room visit, and pregnancy in finding her complaints not credible. The ALJ correctly considered Plaintiff's beer consumption and smoking in his credibility analysis; both findings are factual and relevant. Plaintiff had a history of alcohol consumption. At the administrative hearing, Plaintiff stated she had lost her license due to a driving under the influence conviction (R. 34). The ALJ noted that Plaintiff had "sought emergency treatment for pain but she was observed to have gotten up and walked out to smoke cigarettes." Dr. O'Mara, who made this observation, also noted Plaintiff showed no "concerning findings on physical examination of any acute pathology" and had no "concerning findings on physical examination." Dr. O'Mara found Plaintiff's motor strength and sensory exam to be intact, she had 5/5 strength in all extremities, her lower extremities were symmetric, her Homans sign was negative, she had no swelling or tenderness (R. 421-22). The ALJ's considering Plaintiff's beer consumption and noting Plaintiff was able to walk out of the emergency room in order to smoke cigarettes in October, 2007, is supported by the evidence.

45

As to Plaintiff's pregnancy, the ALJ discussed Plaintiff's having given birth, vaginally, to a full-term infant on November 7, 2008, and that Plaintiff "reported that her chronic hip pain was better since delivery" (R. 21). The ALJ further found her pregnancy did "not support the pain and limitations alleged" (R. 24). The undersigned agrees. On October 9, 2007, just six (6) weeks after Plaintiff's fall, she refused an x-ray because, as she told Dr. Nascone, it was "not clear whether she [was] pregnant" (R. 260). Plaintiff did become pregnant in February, 2008. During her pregnancy, on August 7, 2008, Dr. Draper found that Plaintiff had full range of motion of both hips and no motor or sensory deficit (R. 447). He reviewed Plaintiff's x-rays and decided Plaintiff could deliver the baby vaginally (R. 446). After Plaintiff delivered her baby, she was in "stable condition" (R. 484). Dr. Draper opined that he expected Plaintiff would "do a lot better . . . as she recover[ed] from her delivery" (R. 445, 500). In fact, Plaintiff's symptoms had improved after the delivery of her baby. On December 22, 2008, she informed the nurse midwife at Shenandoah's Women's Health Center/Women's Health that her hip pain, even though it was "still present" was "better since delivery" (R. 454). On June 16, 2009, during treatment at the City Hospital Emergency Department after a fight, Dr. Ellis found Plaintiff had no pain on palpation of the cervical, thoracic or lumbar spine. All of her reflexes were symmetrical. She had no pain with compression or movement of her hips. Her gait was steady (R. 476, 480). On July 24, 2009, Dr. Draper found Plaintiff's hip motion was good and her straight leg raising test was equivocal. An x-ray that showed her "hip joints . . . look[ed] good and the pelvis [was] healed in good position" (R. 499). The ALJ's finding as to Plaintiff's pregnancy is supported by substantial evidence.

Finally, Plaintiff contends that the ALJ failed to correctly evaluate the circumstances surrounding Plaintiff's non-compliance with a pain agreement. The ALJ considered Plaintiff's being

46

denied continued pain treatment by Dr. Duffy because of her non compliance with the pain agreement and her failing to obtain blood work and make an appointment with an orthopedist as instructed to do during her obstetric care at Shenandoah Community Health Center/Women's Health (R. 23-24). It was noted, on June 17, 2008, at Shenandoah Community Health Center/Women's Health, that Plaintiff, who was pregnant, had a positive urine drug screening. She stated she had medicated with "some 'old Rx for Oxycodone.'" She had not obtained blood work as she was previously instructed to do. She had not made an appointment with an orthopedist, who would manage Plaintiff's pain medication prescriptions (R. 459). The ALJ accurately evaluated this evidence. The ALJ also accurately evaluated the evidence relative to Plaintiff's being denied pain treatment due to non-compliance with a pain agreement. Plaintiff was evaluated by Dr. Duffy, for pain management, on December 1, 2008 (R. 449). Dr. Duffy prescribed Clonazepam, Cymbalta, Ibuprofen, and Oxycodone (R. 451). Then, on December 9, 2008, Plaintiff was prescribed Oxy IR by Dr. Draper (R. 500). On February 19, 2009, Dr. Draper reported that Plaintiff had been "[t]aken on as a new patient by Tressie Duffy around the 1st of December but apparently it was found that she had gotten medicine from me and Dr. Duffy dropped her as a patient since this was in violation of their Pain Agreement." Plaintiff stated she "never got any medicine from" Dr. Draper on December 9 and insisted she had "abided by the Pain Agreement." Dr. Draper noted that neither he nor his staff was able to "find any evidence that this prescription that we have a record of was ever filled anywhere in this area" (R. 499). Then, on March 5, 2009, Dr. Draper wrote a letter to Dr. Duffy, asserting therein that Plaintiff had telephoned his office in December, 2008, and requested a prescription for medication, which he wrote, and which was "picked up" by someone. Dr. Draper wrote that he recognized that Plaintiff had, at the time she requested the prescription from him in

47

December, 2008, "entered into some sort of medication agreement with" Dr. Duffy.  Dr. Draper noted that, after a careful search, [he had] not been able to find that the [December, 2008] prescription was ever filled anywhere."  He informed Dr. Duffy that he believed Plaintiff was "telling the truth about this." (R. 498).  Based on this evidence, the ALJ's decision that Plaintiff had been denied pain treatment due to noncompliance with a pain agreement is accurate.  As noted above, that is exactly what occurred.  Whether Plaintiff ever got the prescription filled is irrelevant; after she entered into the pain medication agreement with Dr. Duffy, she telephoned Dr. Draper's office and secured a prescription for Oxy IR, which was retrieved.  Plaintiff's pain agreement with Dr. Duffy was, therefore, terminated.  There is no misunderstanding, as alleged by Plaintiff.  The ALJ was correct in his assessment of this evidence.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984).

For all of the above stated reasons, the undersigned finds that the ALJ's assessment of Plaintiff's credibility regarding her pain is supported by substantial evidence.

## VI.  RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI.  I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the

48

Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _16_ day of September, 2011.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE